Good morning, Your Honors. Ben Coleman for Mr. Heckenkamp. What I'd like to do is start off with the reasonable expectation of privacy issue and then move on to the merits of the searches themselves. Last week, this Court decided a case called United States v. Ziegler and I submitted a Rule 20HA letter. I just don't know whether it's made its way to the Court yet. We're familiar with the case. Okay. In any event, Ziegler is very similar to the cases that the government cites. Ziegler involves an employee who was using an employer's computer at his office, and the employer had informed the employees that they would be monitoring their computer usage. And in that case, this Court found that while the defendant had a subjective expectation of privacy in his computer, he did not have an objective expectation of privacy. It's our position that the circumstances of this case – and by the way, Ziegler, I think, went out of its way to say it was really a very fact-specific case, that based on those facts, this Court found no reasonable expectation of privacy. In this case, we have a dramatically different situation. We have the defendant who owns the computer. It's his own computer. It's in the privacy of his own dormitory room. And I think the one area – that's undisputed. The one area where there is a dispute is whether the university had policies that governed or allowed access to his computer. The government has pointed to two policies, which the district courts below accepted as indicating that monitoring of computer usage was allowed. It's our position that if you look at the plain language of those policies, it is clear that they do not apply to a student's individually owned computer used in his dormitory room. The first policy is what I've called the faculty policy. It is clear on its very language that the policy only applies to university-owned computers used by the faculty and staff at their offices or workstations. Let's assume, for argument purposes, that he did have a reasonable expectation of privacy. What is wrong with what the university did? Okay, then that leaves the merits of the searches. In this case, the university computer investigator who was working with the local police and the FBI searched – first, he remotely searched Mr. Heckenkamp's computer without a warrant. Now, the government below did not argue – You say search. Is this when he tried to determine whether it was 117 or 120? No. I'm talking about when he actually went into the computer itself and – In the dorm room? Well, he remotely – his first search is he remotely accessed the computer. He – Did he download anything? He did not download anything. He went through the computer, searched the various files, determined that the computer belonged to Mr. Heckenkamp, and also looked and found what he believed was evidence of hacking activity on the computer. So he actually remotely accessed Mr. Heckenkamp's computer, snooped around, found the information that he was looking for, and then determined, okay, I think Heckenkamp's the guy. That's what he did. It wasn't – I'm not talking about just reviewing the logs of the activity, 117 versus 120. I'm talking about what he did is he actually went into the computer itself and looked through the files of the computer. It's our position that in order to do that, he either needed a warrant or one of the traditional exceptions to the warrant requirement had to apply. Below, the government did not argue edges and circumstances or emergency doctrine. They argued special needs. It's our position that the special needs doctrine is just not applicable in this type of case. Special needs usually applies where it's sort of a programmatic search where, for example, all employees are being tested for drugs or all – Wouldn't the university official have discovered this anyway? When they went to the dorm room, your client authorized them to look in the computer, right? Well, it's our position that the alleged consent to search was tainted by both the remote search and the illegal entry into the dormitory room. So that's why we believe that the case needs to be sent back for a fruit-of-the-poisonous-tree analysis. It's our position that because there were Fourth Amendment violations preceding the alleged consent, that that consent was tainted. And so your argument is, is it based on the notion that when a university computer system finds proof of hacking and tries to locate the computer that's hacking in, that's using their own system to do that, that that constitutes a search? It constitutes a search if they access the individual's computer and look through the various files in the computer. If the defendant has a reasonable expectation of privacy in that computer, which we believe that he did, then if an agent does that without either a warrant or without one of the exceptions to the Fourth Amendment warrant requirement applying, that is an invalid search. So it's our position that the only – there clearly was no warrant. That's undisputed. The question is whether, when he conducted the search, whether either it was justified under the special needs, exigent circumstances, or emergency doctrines. And it's our position that none of those three doctrines apply. You would agree, wouldn't you, that Mr. Savoy had a perfect right to search the university network computer? Yes. And that's mostly what he did, didn't he, in the initial phases? In the initial phases, yes, and we're not challenging that. No, so what – describe specifically what he did remotely that you object to. He remotely – Because he had already found the computer. He had already ascertained, not accessing the computer, but looking just at the university computer, that this was likely the computer that was causing the – or responsible for the hacking, right? He actually had it. What he had discovered is that he believed that – he had discovered that the mail server, the university's mail server, had been accessing this computer that was located at a particular IP address, which is at this 117 IP address. Yes. Okay. So he knew that – he didn't know whether the 117 address was responsible for the hacking or not, but he knew that somebody was accessing that 117 address from the mail server, and he didn't know whose computer 117 was. He just knew that the computer that he thought may somehow be involved, either it was being hacked or it was doing the hacking, was located at 117. But he did not know whose computer it was, and he did not know how it was involved at all. And what he did is, by accessing the computer, by remotely searching the computer, he was able to determine that the computer was his computer, and he was able to determine that he thought he saw hacking tools or hacking files on that computer. So we're not challenging his searching of the logs, but we are challenging when he actually went in to remotely access Mr. Heckenkamp's computer and searched around. He essentially hacked Mr. Heckenkamp's computer is what he did. And we are claiming that that was an invalid search. In addition, we are claiming that the search of the room itself, which was without a warrant, was also invalid. And so both of these invalid searches tainted the subsequent consent. His special needs argument is that I'm working for the university and we've got a special need to protect the university mail system from hacking. I gather that's the special needs argument they're making, and that I'm going into this computer basically as a means of protecting the university's non-law enforcement interests. Right. That's their claim. And it's our position that for a variety of reasons special needs doesn't apply, the first being that special needs can only apply if obtaining a warrant is impractical. And in this case, the special needs exception can't sort of circumvent the exiting circumstances and emergency doctrine. The bottom line is that there has to be some type of impracticality in obtaining a warrant. And in this case, they were investigating this case for days, and in fact, they all met. The computer investigator, the local police, and the FBI all had a conference at 3 p.m. on December 8th and determined that, well, we'll just wait and sit tight until the next day, and then we'll go interview Mr. Heckenkamp the next day to figure out what's going on. And then seven hours later, the computer investigator decided to hack into Mr. Heckenkamp's computer. So there was no reason why a warrant could not have been obtained in this case. There was plenty of time. At least a telephonic warrant could have been obtained. There was plenty of time to do so. And there just simply was no exigency or emergency or even special need that somehow circumvented the warrant requirement in this case. And I'll reserve the remaining minute for rebuttal unless there are any other questions. Roberts. Roberts. I don't see any. Thank you, counsel. You have about a minute. We'll hear from the State at this time, the United States at this time. Mr. Chu. Thank you, Your Honor. May it please the Court. My name is Hanley Chu, and I represent the government in this appeal. Now, this appeal is about two searches. The remote access search conducted by the University of Wisconsin Computer System Administrator, Jeffrey Savoy, of the defendant's computer, and the entry by Mr. Savoy of the university police into the defendant's dormitory room to disconnect the defendant's computer from the university system. I'd like to discuss the remote access search first and then turn to the entry into the dormitory room. Concerning the remote connection, two district courts expressly found that there was a valid university policy concerning access to electronic data and other information, and it applied to this defendant to eliminate any reasonable expectation of privacy that this defendant had in his computer. In order to overturn those decisions — I'm sorry, those findings, this Court would have to find that those district courts were clearly erroneous and that there were no facts in the record to support those findings. Well, I guess the question is whether those policies really are aimed at this kind of a computer at all. And if they're not, maybe two district courts were wrong. Your Honor, the policy is aimed toward users of the university computer services. It may well be when the policy or policies were written that the authors of the policy didn't envision someone bringing their own laptop and hooking it up to the university system, but that, in fact, is what happened here, right? That is, Your Honor. And what language of the policy do you point to that clearly covers that instance, when someone uses their own computer, their own personal computer, to hook up to the university system? Well, the language of the policy is sufficiently broad so that let me actually point to three — three places in the policy. The first place would be the opening statement of the — the opening statement in the introduction of the — to the policy, which is located at page 35 of the excerpts of record. That clearly states, The Electronic Data Advisory Committee was created by the University Committee to clarify the privacy and confidentiality status of electronic data and to draft procedures for the university to follow in providing access to information in this form. That statement is sufficient — that statement is sufficiently broad to cover — to cover all users — to cover all users of the university system. I would also refer — this is your excerpt? I'm sorry. The excerpt of the defendant, Your Honor. Okay. And it's at page? Page 35. I have it. Now, I cited to the first statement — the first sentence in — in the introduction. I'd also like to — I'd also like to cite to the fifth paragraph that statement, which says, In general, all computer and electronic files should be free from access by any but the authorized users of those files. Exceptions to this basic principle should be kept to a minimum and made only where essential to — and I'm going to skip the exceptions that don't apply. Two, protect the integrity of the university and the rights and property of the state. Three, allow system administrators to perform routine maintenance and respond to emergency situations such as combating viruses and the like. So your — your position is that the general broad statements in the policy cover, notwithstanding that there is no specific reference to using personal computers to access the university system? Yes, Your Honor. I would also like to cite to paragraph 5b of the actual policy itself, which states, Nothing in these procedures is meant to preclude computer system administrators from authorizing the routine maintenance of campus computer or communication systems or the rectification of emergency situations that threaten the integrity of the campus computer communication systems, provided that use of access files is limited solely to maintaining or safeguarding the system, which may include safeguarding the system from illegal use or solving specific problems. That's the instance we have here. The defendant is hacked into the university system and is using the university system to hack into other systems, which is an improper and illegal use of the university system itself. Let me ask a question that turns to the actual physical entry into the defendant's dorm room. Yes, Your Honor. Is it the government's position that that was university-generated and it had nothing to do with the criminal investigation? Correct. The government's position — If that's your position, can you tell me why the university police advised Mr. Heckenkamp of his Miranda rights? Well, Your Honor, they did not advise Mr. Heckenkamp — It is correct that when they encountered him, he was given a Miranda warning. Your Honor, he was not — Is that a yes or no? Yes, Your Honor, and — He was given a Miranda warning. Yes, but after — but only after the — Mr. Savoy and the university police went into his dormitory room. The Miranda warning — When they went in, he wasn't there, right? He wasn't — he was not — Real hard to get straight answers out of you for some reason. At the first encounter with Heckenkamp during this scenario, he was advised of his Miranda rights, wasn't he? No, Your Honor. Can I — can I give you the timeline, please? Sure. My apologies. Well, regardless of timeline, if this was purely a university activity designed to protect the computer system of the university, why was he advised of his Miranda rights? He was advised of his Miranda rights after Mr. Savoy disconnected his — his computer from — from the university system. After — after Mr. Savoy did that, it was then that the university police and Mr. — and Mr. Savoy questioned the defendant. The timeline is Mr. Savoy and the university police show up at the dormitory room. They — they — there's a little bit of a discrepancy as to which dormitory room it is. It's either 115 or 107. The — Mr. Savoy and the university police go to 115 — the 115 room first. They determine that that is not the computer that's been used to — That's where 117 was, right? Oh, no, no. I'm sorry. 117 is the IP address. The room number, that's where the computer access point was, and it turned out to be another room. Correct. That — that is what — that is where the housing records said that the 117 IP address was. So Mr. Savoy and university police went to check that room first. It was determined that that was not the correct room with the — with the correct IP address. It's at that point that Mr. Savoy and the university police head toward room 107, which is — which is Mr. Heckenkamp's room. Now, as the head — I'm not searching for an answer or a response or an argument that tells me why, if the finding of the dorm room and the entry and the disconnection of the computer and the criminal investigation, why Heckenkamp was given a Miranda warning? Well, Mr. Heckenkamp was given a Miranda warning, Your Honor, only — only after — You've already — you've already told us that. But if this activity had nothing to do with the criminal investigation, why was he so advised? Your Honor, after — after the computer was disconnected, the university police then got consent from Mr. — from Mr. Heckenkamp to — got consent from Mr. Heckenkamp to, you know, to log on to this computer to confirm that it was the same computer. It's at that point that the police — the university police and — the university police and Mr. Savoy go and interview Mr. Heckenkamp. It's only after the — it's a government's contention. It seems to — it just seems to me, and maybe I have this all wrong and backwards, that if their interest is purely in severing the link between this computer that they suspect of doing unauthorized things on their system, that once they achieve that disconnection, they're done. There's no reason to give a Miranda warning, and there's certainly no reason to interview him. Tell — tell me why that thinking's wrong. Well, there is a reason to interview him, Your Honor, because the — Mr. Savoy does not know — Mr. Savoy and the university police don't know what Mr. Heckenkamp's already done to the — to the system and what he — he might have launched viruses. They — they just don't know. So — so there is — there is actually — there is actually a reason to interview him, to learn the extent of the prior intrusions, not — not necessarily to other computer systems, but to the university system, Your Honor. Okay. Are you quite sure that consent was given before the Miranda rights were — were administered? Well — Are you absolutely sure about that? Well, consent to log on to the computer. No, no. That's not even — Consent to make the copy of the disk. Oh, you mean consent — consent to image the — consent to image the computer? Yes. Yes, Your Honor. I — it's the government's — Normally, when a judge asks you if you're quite sure and he's got his thumb on a portion of the record, he's — he's wondering if you have a reason to be quite sure. Now, if you want to go ahead and say yes, go ahead. Yes, Your Honor. You're sure?  Okay. Okay. Thank you, Your Honor. Where's the — the — the consent — you started to give a timeline, but any — they go in and they unplug the computer as they're coming out to encounter Mr. Hackenkamp, I — I believe. Yes. They then ask him if he would consent to let them look at the computer. This is before any warnings are given? Yes, Your Honor. Okay. And he says, yes, you can look. They look and discover what? Clear evidence of hacking or — No. They — what they do is they — they look at the computer. After Mr. Hackenkamp has given — after Mr. Hackenkamp has given consent, has given his password to log on to the computer, what Mr. Savoy does is he gets on the computer, he types two commands to verify that that is the same computer that he remotely accessed earlier, that that computer is the computer with the 120 IP address. Okay. So he's basically just getting — making sure that that's the address. Correct. Correct, Your Honor. Then they turn around and read — Miranda writes, and I guess, what, take him — when was he taken into custody? He was not taken into custody at that point. It's my understanding that they took him — they took Mr. Hackenkamp down to kind of a university lobby, and it's there — it's there that they basically questioned him. Well, the record says, did Mr. Hackenkamp agree to speak with you? Yes, he did. And then — well, this is after. They sit down at a table. They give him the Miranda warnings. He signs them away. Here's the question. At some point, did Detective Scheller ask Mr. Hackenkamp whether you could make an image or a copy of the computer hard drive? Yes, he did. And this is during the questioning. Detective asked if you could make a disk image. You could make an image analysis for the computer. What was the defendant's response? Sure. That sequence would seem to me to indicate that sits down, signs the form, and at some point in the conversation, they get consent to search the hard drive. Do you have another point of the record you can point — another part of the record you can point to that would indicate to me that consent to search the hard drive occurred before the Miranda warning? No, not, Your Honor. I apologize. Okay. Okay. Thank you for your argument. You have under a minute for rebuttal, if you'd like to take it, counsel. Thank you, Your Honor. And on page 54 of the excerpts, Judge Jones has written in order of fines that the Miranda warnings were given before the consent. But another issue, the following — Do you think that's right or not? Well, there was — Mr. Heitkamp's testimony was that he never consented. So, I mean, but that's what the district court found. The other issue with respect to what was their real purpose when they went there, I would also — if the purpose was only just to disconnect the computer, I guess the real question is why did Savoy and the officers bring all this fancy equipment to make a copy of the hard drive? I mean, that's something that's always been a big mystery to me, is that if all they wanted to do was disconnect the computer, they didn't need to bring all this other fancy equipment that they had with them ready to go to copy the hard drive, which is a very sort of laborious-type process. The only other thing is that on page — the government, with respect to the policies on page 35 of the excerpts, they failed to address certain parts of that introduction which say that the proposed policy does not address how departments and schools may access students' instructional accounts. And then the next paragraph is the faculty adopt the following policy and procedures to govern access to electronic files controlled by faculty and staff. The policy is designed to go to the faculty and the staff, not to students, and they keep on ignoring that very language in the policy. Thank you. Roberts. Just one quick question. Your client has served the eight months? He's served — and he's actually here today. He's finished home confinement, and he's sitting in the front row. What remaining constraint is there on him? He's still under supervised release, and he obviously has the felony convictions on his record, which — he's a very talented young man, and it's making it hard to get the employment opportunities. Okay. Thank you. Thank you. The case just argued will be submitted for decision and will proceed to the United States v. Shuler.
judges: Canby, Thompson, Hawkins